NUMBER 13-07-00558-CR



 COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

JOHNNY OSCAR VILLARREAL, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 156th District Court


of Bee County, Texas.


 


MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza
 

 Appellant, Johnny Oscar Villarreal, was charged by indictment with one count of
murder and one count of engaging in organized criminal activity. See Tex. Penal Code
Ann. §§ 19.02(b)(1) (Vernon 2003), 71.02(a)(1) (Vernon Supp. 2008). The jury found
appellant guilty of both offenses, and the trial court assessed concurrent life sentences in
the Institutional Division of the Texas Department of Criminal Justice ("TDCJ") with no fine. (1) 
By four issues on appeal, appellant contends that: (1) the evidence adduced at trial was
legally and factually insufficient to sustain his convictions; (2) the trial court erred in denying
his entrapment defense; (3) the prosecutor engaged in prosecutorial misconduct by asking
leading questions and referencing pre-drawn diagrams, contravening the trial court's
instructions; and (4) the trial court erred in admitting evidence of his extraneous offenses. (2) 
We affirm.

I. Factual and Procedural Background


 On October 5, 2006, a Bee County grand jury indicted appellant for murder and
engaging in organized criminal activity. See id. §§ 19.02(b)(1), 71.02(a)(1). The indictment
provided that:


 And it is further presented in and to said Court that deadly weapons, to wit: 
a gun and a knife, was [sic] used or exhibited during the commission of the
aforesaid offense and that the Defendant used or exhibited said deadly
weapons or was a party to the aforesaid and knew that deadly weapons
would be used or exhibited . . . .


Moreover, the indictment contained an enhancement paragraph referencing appellant's
previous conviction for felony aggravated assault.

1. State's Evidence


 The State called several witnesses to opine on the events leading up to, during, and
after the murder of Donald Bonham. On the evening of April 17, 2005, Bonham attended
a dance at the Chick-a-Saw Club (the "Club") in Beeville, Texas. Bonham, an ex-member
of the Hermandad De Pistoleros Latinos ("HPL") gang, had recently been released from
prison, where he was serving time for transporting illegal aliens. (3) Molly Cox, a bartender
at the Club, recalled seeing Bonham arriving at the Club at around 11:00 p.m. and wearing
a cowboy hat. Cox remembered that Bonham appeared to be in a happy mood and that
they discussed Bonham doing some carpentry work at her house. Cox recalled that
Bonham danced with two girls and spoke to someone "at the end of the pool table." At the
Club's closing time, Bonham asked Cox if he could leave out the back door; she denied
his request, stating that the back door was for employees only.

 Another patron of the Club, Joann Medellin, observed that on the night of the
incident, several men would occasionally go into the restroom together. This appeared odd
to Medellin because "you don't usually see boys going--men going into the bathroom at
the same time." As she was leaving the Club, Medellin heard gunfire and saw people
running towards the back of the Club. She observed a man--Bonham--fall down, and she
immediately ran inside the Club to call for help. Medellin, being licensed in CPR, then went
to see if Bonham needed help. As she was helping Bonham, she observed a white van
rapidly take off out of the Club's parking lot.

 Ruben Maddy Aleman, an admitted HPL member, testified that he was convicted
of murder and organized crime for his role in the killing of Bonham. See generally Aleman
v. State, No. 13-07-0049-CR, 2008 Tex. App. LEXIS 2938 (Tex. App.-Corpus Christi Apr.
24, 2008, pet. ref'd) (mem. op., not designated for publication). Ruben stated that he had
known appellant since 1989 and that appellant was the leader of the HPL at the time of
Bonham's murder. Ruben then recalled a previous incident where he was convicted of
public intoxication. In that incident, Ruben attended a bar function with appellant, and
appellant directed him and another HPL member to "take care of some business" outside. 
Prior to going outside, appellant offered Ruben a black .25 caliber handgun; however,
Ruben told him that he did not need a gun. Subsequently, a fight ensued, and Ruben was
arrested for public intoxication.

 As to the night in question, Ruben testified that he accompanied others, including
his nephew John Phillip Aleman, to a dance at the Club. Ruben remembered that the Club
was quite crowded that evening and that appellant attended with his wife and Joe Quin
Villarreal, among others. Appellant later asked Ruben if he wanted to "take out" Bonham. 
Ruben declined, so appellant then went to the restroom. Joe Quin and John Phillip
accompanied appellant in the restroom. Ruben also followed the group into the restroom
and observed appellant trying to give an old .22 caliber pistol, referred to as the "ugly
duckling," to John Phillip. Ruben recognized this handgun as Joe Quin's. Upon seeing
John Phillip accept the gun from appellant, Ruben took it and gave it back to appellant. 
Ruben did not want John Phillip getting involved; however, John Phillip subsequently made
repeat trips to the restroom to meet with appellant.

 As he left the Club, Ruben noticed that appellant, Joe Quin, John Phillip, and
Bonham were already fighting. Bonham screamed out for Ruben to help while appellant
and Joe Quin were hitting him repeatedly. Ruben then saw appellant and John Phillip stab
Bonham with knives. John Phillip used a hook knife to stab Bonham; Ruben did not
believe that appellant's knife was left at the scene. Ruben intervened to help Bonham, but
Ruben ended up getting cut on his lip by Bonham. Ruben recalled that Bonham was
wearing the cowboy hat that was found at the scene. Ruben tried to help Bonham flee, but
they tripped and Bonham fell on top of Ruben. As he was falling, Joe Quin shot Bonham. 
After Ruben pushed Bonham off of him, Joe Quin shot Bonham a second time. Ruben
then saw appellant run from the scene and get into a white van. (4) 

 Contrary to appellant's allegations, Ruben denied bragging about his participation
in the murder of Bonham. Ruben also denied appellant's assertion that Ruben took it upon
himself to "take out" Bonham without any direction from appellant.

 Joe Quin testified that he participated in the murder of Bonham. Joe Quin was told
by several HPL members that appellant was the leader of the HPL in the Beeville area. 
Joe Quin first met appellant at a barbecue in 2005. Shortly thereafter, Joe Quin began
selling marihuana for appellant. Joe Quin sold the marihuana for over a year even though
he still was not a member of the HPL. Eventually, Joe Quin was made a member of the
HPL after appellant and appellant's brother read him the rules and regulations of the HPL. 

 On the night of Bonham's murder, Joe Quin stated that he went to the Club for a
tejano dance. He planned to meet up with appellant and other HPL members. Once
appellant arrived, he instructed Joe Quin to keep an eye on Bonham to make sure that
Bonham did not leave. Appellant later told Joe Quin that "we had to get this guy [Bonham],
that we had to take him out" and provided Joe Quin with the gun used to shoot Bonham. 
Joe Quin testified that appellant kept all the guns for the HPL members to ensure that "we
were always ready for something." Prior to the Club's closing, Joe Quin met with appellant
and John Phillip in the restroom. Joe Quin noted that appellant first instructed John Phillip
to take Bonham out, but John Phillip refused to do so. Appellant then gave Joe Quin the
.22 caliber pistol and told him that he "was next in line to show [his] true colors" and that
by taking Bonham out, it was his "ticket to get all the way in." Joe Quin subsequently took
the gun from appellant.

 Per appellant, Joe Quin was to first provoke Bonham to get him to go outside the
Club. Joe Quin told Bonham that he had "a very personal problem about him [Bonham]
and that we have to take care of it." Bonham did not know Joe Quin, but he met Joe Quin
outside a few minutes later. Once Bonham got outside, Joe Quin called him over to some
trees that surrounded the Club. Shortly thereafter, appellant and several other gang
members came outside and "rushed" Bonham. Joe Quin noticed that appellant's wife went
to position the white van for a quick getaway. He also heard Ruben scream after getting
cut and saw appellant holding Bonham's arm while others were stabbing Bonham. 
Appellant then instructed Joe Quin "[t]o do [his] job." While standing over Bonham's body,
Joe Quin shot Bonham twice. Joe Quin then saw appellant run towards the white van and
take off. 

 Joe Quin testified that he observed that appellant had a knife that night. Appellant
called Joe Quin the next day to ask if he "was okay, if I had been cut or anything, if I had
talked to anybody, if I had stashed the gun, if I wanted to go into town, if I wanted to hide
out or anything." Joe Quin was eventually arrested and convicted for his role in the murder
of Bonham. 


 Officer Jason Alvarez, Sergeant Mike Willow, and Sergeant Kevin Behr conducted
the investigation of the crime scene. They recovered two knives outside the Club: a
brown-handled knife and a silver hooked knife. They also found .22 caliber brass casings
in the roadway by the Club, a cell phone, and a cowboy hat. (5) Standard police protocol was
followed in the collection of the evidence. Each testified that there was significant amounts
of blood at the crime scene, but no eyewitnesses came forward to describe the attack or
to identify appellant. The knives and the brass casings were sent off for analysis; however,
tests conducted on the items were inconclusive. 

 Lieutenant Reagan Scott, a narcotics investigator, testified that he arrived at the
crime scene at 1:26 a.m. and that he assisted in the investigation. He further testified that
he had dealt with appellant on numerous occasions when he was working as a patrolman. 
Lieutenant Scott recalled an incident transpiring on February 19, 2005, whereby appellant,
Ruben, and appellant's wife, Anne Marie Villarreal, were arrested at the local Poppy's Club. 
Appellant was charged with possession of a firearm by a felon; (6) Ruben was charged with
public intoxication; and Anne Marie was charged with possession of marihuana and public
intoxication. Appellant agreed to work with Lieutenant Scott as a confidential informant "to
work off his wife's case." Appellant assisted Lieutenant Scott as an informant on narcotics
cases in "Nueces County, Mathis, and in the Five Points area." Appellant openly admitted
that he was an HPL member, and TDCJ records did not reveal that appellant had
attempted to get out of the HPL through the prison system. (7) Lieutenant Scott testified that
confidential informants were not immune from the law and that they would be arrested and
prosecuted for engaging in criminal activities. 

 About thirty minutes after he had arrived at the crime scene, Lieutenant Scott called
appellant on his cell phone to find out if appellant had any information about the murder. 
Appellant, however, did not answer his cell phone, so Lieutenant Scott left appellant a
message. Appellant did not return Lieutenant Scott's phone call until 12:00 p.m. that day. 
When appellant returned Lieutenant Scott's phone call, he stated that he knew why
Lieutenant Scott was calling. Appellant admitted that he was at the dance that night and
that he had witnessed the assault on Bonham. Appellant accused John Phillip, Ruben,
and Joe Quin--all HPL members--of killing Bonham. 

 Lieutenant Scott then got appellant to engage in a recorded telephone conversation
with Joe Quin. In this conversation, Joe Quin admitted to shooting Bonham. Law
enforcement subsequently conducted a search of Joe Quin's house and vehicle pursuant
to a warrant and based on their findings, arrested Joe Quin. (8) Appellant called Lieutenant
Scott a few days later to inform him of Ruben's whereabouts and stated that Ruben was
injured during the altercation with Bonham. Ruben was later arrested, and at first, he
denied being involved in Bonham's killing. 

 Lieutenant Scott, also a gang expert, testified that several gang members identified
appellant as the leader of the HPL in the Beeville area at the time Bonham was murdered. 
Lieutenant Scott also testified that:


 According to the rules and structure of the prison gang which folds into when
they are out of prison to a criminal street gang, they are required to have
authorization from command authority to commit a violent act. They have
to--they are trying to prevent wars with other gangs, et cetera, so to go out
and hurt someone you actually have to have permission to do that except for
the fact if it's in defense of your own person or a fellow gang member.


Moreover, Lieutenant Scott noted that HPL members were not permitted to go out on their
own and beat someone up and that members would have to discuss a potential assault
with gang members in order to obtain permission. (9) Finally, he stated that HPL would
regularly conduct meetings at appellant's house and that a knife would be considered a
deadly weapon.

 Ray Fernandez, M.D., Nueces County medical examiner, conducted an autopsy on
Bonham. He noted that "[t]here was a total of 14 sharp-forced injuries which are cut type
wounds or stab type wounds" on Bonham's body. (10) Bonham also had numerous bruises
on his body. Dr. Fernandez testified that he removed two bullets from Bonham's body. 
As a result of his examination, Dr. Fernandez determined that "[t]he cause of death was
multiple gunshot wounds and sharp-forced injuries." (11) 

 Jaime Alvarado, a convicted felon, testified that he knew appellant and that
appellant was the leader of HPL for some period of time dating back to at least 2004. 
Alvarado obtained cocaine from appellant on several occasions. On one such occasion,
appellant expressed that he wanted Alvarado to "take care of"--or, in other words, to kill--
Bonham. Alvarado declined to participate. Alvarado noted that in February 2005, on
Super Bowl Sunday, he attended a party at appellant's house. While there, appellant
again asked Alvarado if he knew who Bonham was. Alvarado replied "yeah." Appellant
then stated that "we really need to take care of him [Bonham]." Shortly thereafter, Ruben,
also an attendee of the party, stated that it was time for Alvarado to "show [his] true colors." 
Again, Alvarado declined to participate. Alvarado then testified that appellant regularly
carried a .22 caliber pistol on his person. Alvarado's testimony was not procured pursuant
to a plea deal. 

2. Appellant's Evidence


 Jim Gilder testified on appellant's behalf. Gilder stated that he was incarcerated in
the Bee County jail with Joe Quin, John Phillip, and Ruben. John Phillip and Ruben told
Gilder that Joe Quin was the shooter. John Phillip was supposed to be the shooter, but
Joe Quin took the gun from him. John Phillip told Gilder that they would have gotten away
with the murder "if only Joe Quin had kept quiet." Gilder also had a conversation with Joe
Quin while he was cutting Joe Quin's hair. Joe Quin admitted that he was the shooter;
however, he also noted that appellant "set up the murder." John Phillip and Ruben also
stated to Gilder that appellant "set up the murder." Gilder also mentioned that Ruben and
Joe Quin were conspiring to get appellant in trouble for the murder.

 On cross-examination, Gilder admitted that he was "going to catch chain to TDC"
because of convictions for burglary of a habitation and possession of a controlled
substance. Gilder then read from a statement that he gave to police regarding his
conversations with John Phillip, Ruben, and Joe Quin:


 "John Phillip Aleman and Ruben Maddy Aleman told me on the night of the
murder they had been drinking and doing cocaine. They said that they got
a call from Johnny Villarreal and he said that they had a meeting at the
Chick-a-Saw Club."

 

 . . . .

 

 "Ruben Maddy Aleman called Joe Quin Villarreal to come over and drink
some beer because he had to talk to John Phillip Aleman and Joe Quin
Villarreal together to see if they are going to be ready for the night."

 

 . . . .

 

 "Joe Quin Villarreal showed up and John Phillip Aleman said that he was
ready if Joe Quin was ready. And Ruben Maddy Aleman told them that he
would be there to watch everything go down."

 

 . . . .

 

 "Ruben Maddy Aleman told me that he would have got[ten] away with it if it
would have been just John Phillip Aleman and Joe Quin Villarreal, but he
said there was too many people that knew about it. John Aleman told me
that he will beat the case because Ruben Maddy Aleman is going to take the
blame for him. Joe Quin Villarreal told me that he was the shooter because
he was bragging saying that John Phillip Aleman and Ruben Maddy Aleman
just watched, but Ruben Maddy Aleman told me that he was the one who
gave the gun to Joe Quin Villarreal and all he had to do was watch as Joe
Quin Villarreal and John Phillip Aleman did the job."


 Appellant also attempted to call a "Murray Johnson" to testify on his behalf, but
Johnson declined to testify for fear of retaliation. The defense then rested.

II. Sufficiency of the Evidence


 In his first issue, appellant argues that the evidence supporting his convictions was
legally and factually insufficient. Specifically, appellant argues that the only evidence
connecting him to the murder was obtained with "co-defendant testimonies" which were not
corroborated.




1. Standard of Review

 

 In conducting a legal sufficiency review, we view the relevant evidence in the light
most favorable to the verdict to determine whether a rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443 U.S. 307, 318-19
(1979)); Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). The trier of fact
is the sole judge of the facts, the credibility of the witnesses, and the weight given to
testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Beckham v. State,
29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). We do not
reevaluate the weight and credibility of the evidence, nor do we substitute our own
judgment for the trier of fact. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000);
Beckham, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational
decision. Beckham, 29 S.W.3d at 151.

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust or the jury's verdict is against the great weight and preponderance of the evidence.
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not
reverse the jury's verdict unless we can say with some objective basis in the record that the
great weight and preponderance of the evidence contradicts the verdict. Id. at 417.

 The State is not required to present direct evidence, such as eyewitness testimony,
to establish guilt. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).
"Circumstantial evidence is as probative as direct evidence in establishing the guilt of the
actor, and circumstantial evidence alone can be sufficient to establish guilt." Hooper, 214
S.W.3d at 13; Guevara, 152 S.W.3d at 49. The law does not require that each fact "point
directly and independently to the guilt of the appellant, as long as the cumulative effect of
all the incriminating facts is sufficient to support the conviction." Hooper, 214 S.W.3d at
13; Guevara, 152 S.W.3d at 49.

 Both legal and factual sufficiency are measured by the elements of the offense as
defined by a hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex.
Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet.
ref'd). Under a hypothetically correct jury charge, a person commits murder if he
"intentionally and knowingly causes the death of an individual" or intended to cause serious
bodily injury and committed an act clearly dangerous to human life that caused death. Tex.
Penal Code Ann. § 19.02(b)(1). Moreover, a person engages in illegal organized criminal
activity "if, with the intent to establish, maintain, or participate in a combination or in the
profits of a combination or as a member of a criminal street gang, he commits or conspires
to commit . . . murder . . . ." Id. § 71.02(a)(1).

2. Discussion

 

 a. The Charge


 In this case, the jury could convict appellant of murder if, based on the evidence,
they believed beyond a reasonable doubt that on or about April 17, 2005, in Bee County,
Texas, either:


 . . . JOHNNY OSCAR VILLARREAL, did then and there as a member of a
criminal street gang to wit: Hermandad De Pistoleros Latinos, intentionally
or knowingly, cause the death of Donald Wesley Bonham by shooting and
stabbing said Donald Wesley Bonham with a knife and a firearm, as alleged
in Paragraph 1 of Count 2 of the Indictment;

 

 OR

 

 . . . JOHNNY OSCAR VILLARREAL, did then and there, with the intent to
establish, maintain, or participate in a combination, intentionally or knowingly,
commit the offense of murder by causing the death of Donald Wesley
Bonham by shooting and stabbing said Donald Wesley Bonham with a knife
and a firearm, as alleged in Paragraph 2 of Count 2 of the Indictment . . . .


 b. The Accomplice-Witness Rule

 

 Article 38.14 of the code of criminal procedure provides that "[a] conviction cannot
be had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense." Tex Code Crim. Proc. Ann.
art. 38.14 (Vernon 2005); see Druery v. State, 225 S.W.3d 491, 498 (Tex. Crim. App.
2007). In conducting a sufficiency review under the accomplice-witness rule, a reviewing
court must eliminate the accomplice testimony from consideration and then examine the
remaining portions of the record to see if there is any evidence that tends to connect the
accused with the commission of the crime. Solomon v. State, 49 S.W.3d 356, 361 (Tex.
Crim. App. 2001) (citing Cook v. State, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993);
Thompson v. State, 691 S.W.2d 627, 631 (Tex. Crim. App. 1984)). 

 The non-accomplice evidence need not directly link the defendant to the crime, nor
must if be sufficient to establish guilt beyond a reasonable doubt; rather, the standard is
only that it have a tendency to connect the defendant to the crime. Dowthitt v. State, 931
S.W.2d 244, 249 (Tex. Crim. App. 1996). While the defendant's mere presence at the
crime scene is not sufficient by itself to corroborate accomplice testimony, evidence of
such presence, coupled with other suspicious circumstances, may tend to connect the
accused to the offense. Trevino v. State, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999). After eliminating from consideration the testimony of Ruben and Joe Quin, both
accomplices in the murder of Bonham, a review of the record reveals inculpatory evidence
which tends to link appellant with the murder of Bonham. Medellin testified that she
observed an odd pattern of several men going to the restroom together and a white
van--the same van identified as appellant's getaway vehicle--speed out of the Club's
parking lot. Lieutenant Scott testified that appellant admitted to him that he was an HPL
member and that he witnessed the attack on Bonham. Lieutenant Scott, a gang expert,
also noted that several HPL members identified appellant as a leader of the HPL in the
Beeville area and that according to the hierarchy of the HPL, members were not allowed
to assault another without permission from high ranked HPL members. Both Ruben and
Joe Quin were of lower rank in the HPL than appellant. 

 Moreover, Gilder, a witness for the defense, testified that Joe Quin and Ruben told
him that they committed the murder of Bonham, but that appellant "set up the murder." In
addition, Alvarado, not an accomplice to Bonham's murder, stated that appellant had
expressed a desire to have Bonham killed. In fact, Alvarado testified that appellant asked
him to commit the offense. Finally, Alvarado, a regular buyer of cocaine from appellant,
noted that appellant regularly carried a .22 caliber pistol--the same gun used by Joe Quin
to shoot Bonham--on his person at all times. Based on this testimony, we conclude that
there was sufficient evidence to connect appellant with the commission of the offense. See
Solomon, 49 S.W.3d at 361.

 c. Law of the Parties


 The charge authorized appellant's conviction as a party to the murder pursuant to
section 7.02(a)(2) of the penal code. See Tex. Penal Code Ann. § 7.02(a)(2) (Vernon
2003).

i. Section 7.02(a)(2) of the Texas Penal Code


 Section 7.02(a)(2) states that: "A person is criminally responsible for an offense by
the conduct of another if . . . acting with intent to promote or assist the commission of the
offense, he solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense . . . ." Id. § 7.02(a)(2). Thus, in order to convict appellant of murder
under section 7.02(a)(2), the State had to prove that he aided and abetted Ruben and Joe
Quin with respect to each element of the offense. Woods v. State, 749 S.W.2d 246, 248
(Tex. App.-Fort Worth 1988, no pet.).


ii. Legal and Factual Sufficiency of the Evidence 

to Support a Conviction Under Section 7.02(a)(2)


 "Evidence is sufficient to support a conviction under the law of parties where the
actor is physically present at the commission of the offense, and encourages the
commission of the offense either by words or other agreement." Burdine v. State, 719
S.W.2d 309, 315 (Tex. Crim. App. 1986); Cordova v. State, 698 S.W.2d 107, 111 (Tex.
Crim. App. 1985). The evidence must show that, at the time of the offense, the parties
were acting together, each contributing some part towards the execution of their common
purpose. Burdine, 719 S.W.2d at 315. In determining whether a defendant participated
in an offense as a party, the court may examine the events occurring before, during, and
after the commission of the crime and may rely on the defendant's actions that show an
understanding and common design to commit the crime. Burdine, 719 S.W.2d at 315;
Cordova, 698 S.W.2d at 111; Beier v. State, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985).


 The record contains testimony that appellant, a leader of the HPL, instructed Joe
Quin and other HPL members to kill Bonham. See Tex. Penal Code Ann. §§ 7.02(a)(2),
71.02(a)(1). Joe Quin and Ruben both testified that appellant provided the gun used in the
murder and that appellant actively participated in Bonham's killing. See id. §§ 19.02(b)(1),
71.02(a)(1). Moreover, several witnesses testified that they saw appellant at the Club that
night, that appellant repeatedly expressed a desire to have Bonham killed, and that
appellant conducted a meeting to discuss how they were going to kill Bonham. See id. §§
7.02(a)(2), 19.02(b)(1), 71.02(a)(1). There was also testimony provided that appellant met
with Joe Quin, Ruben, and John Phillip in the restroom of the Club and that appellant
encouraged the individuals to "take care" of Bonham. See id. § 7.02(a)(2).

 On the other hand, Gilder testified that Ruben and Joe Quin committed the murder
without appellant's actual participation and that both Ruben and Joe Quin conspired to get
appellant in trouble for the murder. However, as previously mentioned, Gilder admitted
that both Ruben and Joe Quin told him that appellant "set up the murder." 

 The jury was the exclusive judge of the facts proved and of the weight to be given
to the testimony. Tex. Code Crim. Proc. Ann. art. 38.04. Therefore, the jurors were free
to accept or reject any or all of the witnesses' testimony. See Davila v. State, 147 S.W.3d
572, 575 (Tex. App.-Corpus Christi 2004, pet. ref'd) (citing Alvarado v. State, 818 S.W.2d
100, 105 (Tex. App.-San Antonio 1991, no pet.)); see also Lancon v. State, 253 S.W.3d
699, 705 (Tex. Crim. App. 2008) ("The jury is in the best position to judge the credibility of
a witness because it is present to hear the testimony, as opposed to an appellate court
who relies on the cold record."). In convicting appellant, the jury obviously accepted the
aforementioned testimony offered by the State and rejected the testimony offered on
appellant's behalf. We must defer to the jury's determination. See Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences,
we presume that the factfinder resolved the conflicts in favor of the prosecution and
therefore defer to that determination.") (citing Jackson, 443 U.S. at 326). 

 Based on the foregoing, we conclude that the cumulative force of all the
incriminating circumstances is sufficient to support appellant's convictions for Bonham's
murder and engaging in organized criminal activity. See Hooper, 214 S.W.3d at 13; see
also Guevara, 152 S.W.3d at 49. Moreover, the verdict is not against the great weight and
preponderance of the evidence. See Watson, 204 S.W.3d at 414-15. Appellant's first
issue is overruled. 

III. Entrapment


 In his second issue, appellant contends that he "was entitled to entrapment as a
defense as a matter of law since he help[ed] law enforcement obtain the suspects in the
murder of Bonham." 

1. Standard of Review


 When appellant raised the defense of entrapment at trial, he had the burden of
producing evidence to establish every element of that defense. See Hernandez v. State,
161 S.W.3d 491, 497 (Tex. Crim. App. 2005). He had to present a prima facie case that:
(1) he engaged in the conduct charged; (2) because he was induced to do so by a law
enforcement agent; (3) who used persuasion or other means; and (4) those means were
likely to cause persons to commit the offense. See id.; see also Tex. Penal Code Ann. §
8.06(a) (Vernon 2003). Once he made a prima facie showing of each element, the State
then had the burden of persuasion to disprove entrapment beyond a reasonable doubt. 
See Hernandez, 161 S.W.3d at 498. A review of the jury's rejection of an entrapment
defense focuses on the legal sufficiency of the evidence. See Resendez v. State, 160
S.W.3d 181, 188-89 (Tex. App.-Corpus Christi 2005, no pet.). 

 When an entrapment defense is presented at trial, the fact-finder is authorized to
weigh the evidence and draw a conclusion as to whether the evidence establishes
entrapment as a matter of fact or law. Hernandez, 161 S.W.3d at 500. In reviewing a
jury's rejection of an entrapment defense, we determine whether, viewing the evidence in
the light most favorable to the prosecution, any rational trier of fact could have found the
essential elements of the criminal offense beyond a reasonable doubt and also could have
found against the defendant on the issue of entrapment beyond a reasonable doubt. Id. 
This review must take into account that the trier of fact, not the appellate court, was free
to accept or reject all or any portion of any witness's testimony. Id. In cases where the
entrapment defense is asserted, the fact-finder may disbelieve some or all of a witness's
testimony even when that testimony is uncontradicted. See id. at 501.

2. Discussion

 Here, appellant denied committing any offense, which is inconsistent with
entrapment. See Norman v. State, 588 S.W.2d 340, 345 (Tex. Crim. App. 1979) ("The
defense of entrapment is not available to a defendant that [d]enies the commission of the
offense."). Moreover, appellant failed to demonstrate how law enforcement induced him
to commit the murder of Bonham. See Hernandez, 161 S.W.3d at 497; see also Tex.
Penal Code Ann. § 8.06(a). Appellant merely takes issue with the fact that he provided
information to law enforcement that apparently contributed, in some degree, to his own
undoing. Lieutenant Scott testified that confidential informants were not immune from
prosecution in exchange for their cooperation. In addition, the record does not contain any
motion filed by appellant in the trial court specifically seeking to include an instruction on
entrapment in the jury charge. See Tex. R. App. P. 33.1(a)(1); see also Hernandez, 161
S.W.3d at 498 ("Normally, a defense such as entrapment is a question for the jury to
decide because it is determined largely by weighing facts and assessing credibility."). We
therefore have no basis to conclude that the trial court erred in failing to include an
entrapment instruction in the jury charge. 

 In addition, appellant appears to urge that the trial court should have determined
that appellant was entrapped as a matter of law at a pretrial suppression hearing. The
court of criminal appeals noted the following with respect to the trial court's determination
of the factual issue of entrapment as a matter of law:

 Our's state's reticence to decide the factual issue of entrapment by means
of a pretrial motion is in accord with federal entrapment law. See, e.g.,
Mathews v. United States, 485 U.S. 58[, 63] (1988) ("The question of
entrapment is generally one for the jury, rather than for the court."); United
States v. Kurkowski, 281 F.3d 699, 701 (8th Cir. 2002) ("[T]o show
entrapment as a matter of law, the evidence must clearly show the
government agent developed the criminal plan and that the defendant was
not predisposed to commit the crime independent of the government's
activities."); United States v. Tucker, 133 F.3d 1208, 1217 (9th Cir. 1998)
("To establish [inducement] as a matter of law, the defendant must point to
undisputed evidence making it patently clear that [the government induced]
an otherwise innocent person . . . to commit the illegal act by trickery,
persuasion, or fraud of a government agent."); United States v. Lampley, 127
F.3d 1231, 1243 (10th Cir. 1997) ("Entrapment as a matter of law exists only
when there is undisputed evidence which shows conclusively and
unmistakably that an otherwise innocent person was induced to commit the
act.") (internal quotations omitted); Coronado v. United States, 266 F.2d 719,
721 (5th Cir. 1959) ("[E]ntrapment is a jury question unless evidence is so
clear and convincing that the matter can be passed on by the court as a
matter of law.").

Hernandez, 161 S.W.3d at 499 n.12. At the pretrial suppression hearing, appellant, though
not specifically referencing the defense of entrapment, did not present undisputed
evidence that conclusively showed that the government induced him, an otherwise
innocent person, to commit the murder of Bonham. See id. Therefore, we cannot say that
the trial court abused its discretion in denying appellant's motion for suppression with
respect to entrapment. Accordingly, appellant's second issue is overruled. 


IV. Leading Questions, the Usage of Pre-Drawn Diagrams, and Prejudice


 In his third issue, appellant contends that the prosecutor asked leading questions
over the trial court's instructions to refrain from doing so and used pre-drawn diagrams for
purposes other than demonstration. According to appellant, these actions substantially
prejudiced his case.

1. Standard of Review


 Leading questions are questions that suggest the desired answer. See Tinlin v.
State, 983 S.W.2d 65, 70 (Tex. App.-Fort Worth 1998, pet. ref'd). Rule 611(c) of the
Texas Rules of Evidence states that leading questions may be used on the direct
examination of a witness as necessary to develop his testimony. Tex. R. Evid. 611(c). 
Permitting leading questions on direct examination is a matter within the sound discretion
of the trial court. Wyatt v. State, 23 S.W.3d 18, 28 (Tex. Crim. App. 2000); see Navajar
v. State, 496 S.W.2d 61, 64 (Tex. Crim. App. 1973); see also Wise v. State, 223 S.W.3d
548, 558 (Tex. App.-Amarillo 2007, pet. ref'd). The trial court does not abuse its discretion
in allowing such questions unless appellant can show that he was unduly prejudiced by
virtue of the questions. Navajar, 496 S.W.2d at 61; Wise, 223 S.W.3d at 558. More
importantly, error in allowing leading questions seldom results in reversible error. See Uhl
v. State, 479 S.W.2d 55, 57 (Tex. Crim. App. 1972); see also Moblin v. State, No. 07-07-0175-CR, 2008 Tex. App. LEXIS 4613, at *6 (Tex. App.-Amarillo June 24, 2008, no pet.)
(mem. op., not designated for publication).

2. Discussion


 Counsel for appellant objected to the State's usage of leading questions numerous
times; many of these objections were sustained by the trial court. In sustaining the
objections of appellant's counsel, the trial court instructed the State to not ask leading
questions. However, the State continued to ask leading questions of its witnesses on
several occasions. 

 On appeal, appellant argues that "the prosecutor's continuance to ask leading
questions even after instruction from the court created substantial prejudice against
Villarreal during his trial because evidence was being fed to witnesses by the [S]tate." 
However, appellant fails to explain exactly how his case was substantially prejudiced by
the State's leading questions. See Tex. R. App. P. 38.1(h); see also Navajar, 496 S.W.2d
at 61; Wise, 223 S.W.3d at 558. In any event, the record does not demonstrate that the
State was feeding evidence to her witnesses; instead, the State was merely trying to
develop testimony as allowed by rule 611(c) of the rules of evidence. See Tex. R. Evid.
611(c). (12) Based on the record before us, we cannot say that appellant has shown that his
case was substantially prejudiced by the State's usage of leading questions. See Navajar,
496 S.W.2d at 61; Wise, 223 S.W.3d at 558; see also Uhl, 479 S.W.2d at 57; Moblin, 2008
Tex. App. LEXIS 4613, at *6.

 In addition, the trial court allowed the State to use "pre-draw[n] diagrams" of the
Club to explain the geographical locations of the Club's occupants at various times on the
night of Bonham's murder. The diagrams were allowed for demonstrative purposes only;
they were neither offered nor admitted into evidence. See Markey v. State, 996 S.W.2d
226, 231 (Tex. App.-Houston [14th Dist.] 1999, no pet.) (noting that the trial court's
discretion to permit the use of visual aids, charts, and diagrams during trial is well-established); see also Pitre v. State, No. 09-95-140-CR, 1997 Tex. App. LEXIS 3883, at
**4-5 (Tex. App.-Beaumont July 23, 1997, no pet.) (mem. op., not designated for
publication) (stating that diagrams can be used for demonstrative purposes to clarify
testimony). 

 On appeal, appellant contends that the diagrams conveyed hearsay evidence over
defense counsel objections. However, Texas courts have not treated demonstrative
evidence, whether it be a map, model, drawing, chart, or diagram, as inadmissible hearsay. 
See Pierce v. State, 777S.W.2d 399, 413 (Tex. Crim. App. 1989); Clay v. State, 592
S.W.2d 609, 613 (Tex. Crim. App. 1980); Mayfield v. State, 848 S.W.2d 816, 819 (Tex.
App.-Corpus Christi 1993, pet. ref'd); see also Pitre, 1997 Tex. App. LEXIS 3883, at *4. 
Furthermore, appellant has not adequately explained how the diagrams substantially
prejudiced his case or what hearsay evidence was admitted over objection. See Tex. R.
App. P. 38.1(h). Appellant's third issue is overruled. V. Appellant's Extraneous Offenses


 In his fourth issue, appellant takes issue with the admission of Alvarado's testimony
that appellant was a drug dealer and a gang member. Specifically, appellant asserts that
the admission of Alvarado's testimony constituted unfair prejudice since "no drug [was]
involved in the murder of Bonham."

1. Standard of Review


 The trial court is given wide latitude to admit or exclude evidence of extraneous
offenses. Montgomery v. State, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (en banc);
Poole v. State, 974 S.W.2d 892, 897 (Tex. App.-Austin 1998, pet. ref'd). A reviewing court
must therefore recognize that the trial court is in a superior position to gauge the impact
of the relevant evidence and not reverse a trial court's ruling if it is within the "zone of
reasonable disagreement." Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999);
Montgomery, 810 S.W.2d at 391. In balancing probative value and unfair prejudice under
rule 403 of the rules of evidence, an appellate court presumes that the probative value will
outweigh any prejudicial effect. Montgomery, 810 S.W.2d at 389; see Tex. R. Evid. 403. 
It is therefore the objecting party's burden to demonstrate that the probative value is
substantially outweighed by the danger of unfair prejudice. Hinojosa v. State, 995 S.W.2d
955, 958 (Tex. App.-Houston [14th Dist.] 1999, no pet.); Poole, 974 S.W.2d at 897.

2. Discussion


 Requisite for review of any complaint on appeal is preservation of error. Tex. R.
App. P. 33.1(a); Blue v. State, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000). To preserve
a complaint for appellate review, a party must present a timely request, objection, or motion
to the trial court stating the specific grounds for the desired ruling if the specific grounds
were not apparent from the context. Adams v. State, 180 S.W.3d 386, 399 (Tex.
App.-Corpus Christi 2005, no pet.) (citing Tex. R. App. P. 33.1(a); Blue, 41 S.W.3d at 131).
The complaining party must also obtain an adverse ruling on the objection. Id. Generally,
a party's failure to timely and specifically object at trial forfeits any error. Tex. R. App. P.
33.1; see Blue, 41 S.W.3d at 131.

 Appellant failed to object to Alvarado's testimony as to appellant's alleged drug
dealing; therefore, we conclude that appellant failed to preserve that complaint for appeal. 
See Tex. R. App. P. 33.1(a)(1); see also Blue, 41 S.W.3d at 131; Montgomery, 810 S.W.2d
at 388. 

 On the other hand, appellant did object to Alvarado's testimony as to whether
appellant was the leader of the HPL in 2004, alleging that Alvarado did not have personal
knowledge of appellant's gang member status. The trial court overruled appellant's
objection, and Alvarado testified that he had knowledge that appellant was the leader of
the HPL in the Beeville area. On appeal, appellant has not adequately explained how the
probative value of Alvarado's testimony as to appellant's gang member status was
substantially outweighed by the danger of unfair prejudice. See Tex. R. App. P. 38.1(h);
see also Montgomery, 810 S.W.2d at 389; Hinojosa, 995 S.W.2d at 958; Poole, 974
S.W.2d at 897. Furthermore, it is noteworthy that other witnesses--namely, Lieutenant
Scott, Ruben, and Joe Quin--testified that appellant was the leader of the HPL in the
Beeville area without objection from appellant. Therefore, it is not patently obvious from
the record before us that Alvarado's testimony as to appellant's gang member status
substantially prejudiced appellant's case. Accordingly, we overrule appellant's fourth issue.VI. Conclusion




 Having overruled all of appellant's issues on appeal, we affirm the judgment of the
trial court.

 

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 15th day of January, 2009. 

 
1. Section 19.02 of the penal code provides generally that a conviction for murder constitutes a first-degree felony. Tex. Penal Code Ann. § 19.02(c) (Vernon 2003). The jury also concluded that appellant
committed the murder as a member of a criminal street gang and assessed punishment pursuant to section
71.02 of the penal code, which provides that if a defendant commits or conspires to commit, among other
things, murder as a member of a criminal street gang, the punishment range is one category higher than the
most serious offense. Id. § 71.02(a)(1), (b) (Vernon Supp. 2008). Therefore, appellant was subject to the
punishment range for capital felonies. See id. § 12.31(a) (Vernon 2003). Section 12.31(a) of the penal code
states that an individual adjudged guilty of a capital felony is subject to the death penalty or life in prison
without parole. Id.
2. As allowed by the appellate rules, the State has not filed an appellate brief in response to appellant's
contentions. See Siverand v. State, 89 S.W.3d 216, 219 (Tex. App.-Corpus Christi 2002, no pet.) ("The
Texas Rules of Appellate Procedure require appellant to either file a brief or state that he no longer desires
to prosecute the appeal. Tex. R. App. P. 38.8(b). However, there is no corresponding rule requiring the State
to file a brief in response to appellant's brief."). 
3. Bonham renounced his membership in the HPL while in prison and initiated the process to extricate
himself from the gang. The record contains testimony that once an individual joins the HPL, he is a member
for life; any person attempting to leave the gang would be placed on a list to be killed. Several witnesses
testified that Bonham was "x-ed out," or, in other words, placed on the list to be killed.
4. Ruben testified that appellant's wife was waiting for appellant in the white van.
5. It was later established that the cowboy hat found at the crime scene belonged to Bonham.
6. Because he had previously been convicted of felony aggravated assault, Lieutenant Scott testified
that appellant was not permitted to possess a firearm at the time of the incident.
7. With respect to the Texas Department of Criminal Justice's ["TDCJ"] program for gang members
wanting to leave the gang, Lieutenant Scott noted the following:


 The TDCJ offers a system to assist gang members to actually separate themselves from the
gang. They will offer them funds to have their tattoos covered and assist them in programs
to help them understand ways to get away from the gang community and separate
themselves from gang activities. 


Furthermore, the TDCJ maintains a list of individuals that are marked as ex-gang members.
8. In searching Joe Quin's vehicle, law enforcement found a .38 caliber pistol, a stolen Benelli shotgun,
a scale, a box of ammunition, and some marihuana. Also found in Joe Quin's vehicle was a copy of the rules
and regulations of the HPL. 
9. Former prison gang investigator Clemente Rodriguez testified that the HPL had a hierarchy structure
in that they had: 


 generals, captains and--majors, captains, lieutenants[,] and all down the line. Those in
ranking positions will give out orders to lower ranking members to carry out whatever activity
they want done. . . . [T]hey [lower ranking members] c[ould] be disciplined for not--you know,
for not following the rules. One of the rules is to follow the orders of the ranking structure.


Rodriguez further testified that it would take a member of high rank in the HPL to order the killing of another.
10. Lisa Harmon Baylor, a forensic scientist for the TDCJ Crime Laboratory in Corpus Christi, confirmed
Dr. Ray Fernandez's findings, but noted that appellant was ruled out as a contributor to the crime due to a lack
of DNA evidence found at the scene. Oscar Rivera, a Texas Ranger, later explained that no fingerprints were
obtained from the knives or the brass casings because the knives had smudges which could not be identified
and the brass casings got too hot during the discharge from the gun, which dissipated the moisture of the
fingerprint ridge.
11. Dr. Fernandez described "sharp-forced injuries" as "blunt-force injuries where it's a blunt surface
that is impacted against the body or hitting against the body, and then sharp force is where there is a sharp
edge type weapon that is making the cuts or stab wounds on the body."
12. The trial court did not sanction the State's prosecutor or hold her in contempt for repeatedly asking
leading questions after being instructed not to do so.